Oneida Indian Nation v. Madison County

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: November 6, 2007     Final Submission: July 20, 2009

Decided: April 27, 2010)

Docket No. 05-6408-cv (L); 06-5168-cv (CON); 06-5515-cv (CON)

-------------------------------------

ONEIDA INDIAN NATION OF NEW YORK,

Plaintiff-Counter-Defendant-Appellee,

- v -

MADISON COUNTY AND ONEIDA COUNTY, NEW YORK,

Defendants-Counter-Claimants-Appellants,

STOCKBRIDGE-MUNSEE COMMUNITY, BAND OF MOHICAN INDIANS,

Putative Intervenor-Appellant.[*]

-------------------------------------

Before:   CABRANES, SACK, and HALL, Circuit Judges. Judge
Cabranes, joined by Judge Hall, concurs in a separate
opinion.

Appeal from a judgment of the United States District
Court for the Northern District of New York (David N. Hurd,
Judge). In separate actions consolidated on appeal, the Oneida
Indian Nation of New York (the "OIN") brought suit against
Madison and Oneida Counties to enjoin them from foreclosing on
OIN-owned property for non-payment of taxes. On cross-motions

---

[*] The Clerk of Court is directed to amend the official
caption of this appeal in accordance with the foregoing.

for summary judgment, the district court ruled in favor of the OIN. We agree. We conclude that the OIN is immune from the Counties' foreclosure actions under the principle that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y., 544 U.S. 197 (2005) is not to the contrary. Separately, we conclude that the district court did not abuse its discretion by denying the motion to intervene brought by the Stockbridge-Munsee Community, Band of Mohican Indians. Judge Cabranes concurs in the judgment and opinion of the Court and files a separate opinion, in which Judge Hall concurs.

Affirmed.

DAVID M. SCHRAVER, Nixon Peabody LLP, Rochester, NY, for Defendants-Counter-Claimants-Appellants.

MICHAEL R. SMITH, Zuckerman Spaeder LLP (David A. Reiser, of counsel; Peter D. Carmen of Oneida Nation Legal Department, Verona, NY, on the brief), Washington, DC, for Plaintiff-Counter-Defendant-Appellee.

DON B. MILLER, Don. B. Miller, P.C., Boulder, CO, for Putative Intervenor-Appellant.

ANDREW D. BING, Assistant Solicitor General, State of New York (Andrew M. Cuomo, Attorney General, on the brief; Barbara D. Underwood, Solicitor General; Daniel Smirlock, Deputy Solicitor General; and Peter H. Schiff, Senior Counsel, of counsel; Dwight A. Healy,

2

White & Case LLP, co-counsel), New York, NY, _for_ _Amicus Curiae State of New York_.

RONALD J. TENPAS, Assistant Attorney General; Samuel C. Alexander, Elizabeth Ann Peterson, and Kathryn E. Kovacs, U.S. Department of Justice Environment & Natural Resources Division, Appellate Section; and Thomas Blaser, U.S. Department of the Interior, Washington, DC, _for_ _Amicus Curiae United States_.

SACK, _Circuit Judge_:

This appeal is but the latest chapter in a lengthy dispute over the payment of state and local taxes by the plaintiff-appellee Oneida Indian Nation of New York (the "OIN"). The Supreme Court most recently addressed the OIN's tax obligations in _City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y._, 544 U.S. 197 (2005) ("_Sherrill_"). The Court rejected the OIN's contention that parcels of lands allegedly within the boundaries of an Indian reservation once occupied by the Oneidas, which were sold to non-Indians during the early 19th century and bought back by the OIN on the open market in the 1990s, thereby came under the sovereign dominion of the OIN and were therefore exempt from municipal taxation.[1] The OIN nonetheless now seeks

---

[1] The OIN's suit against Madison County, which is one of the actions consolidated in this appeal, was once consolidated with three other actions involving the City of Sherrill. _See_ _Oneida Indian Nation of N.Y. v. Madison County_, 401 F. Supp. 2d 219, 223 (N.D.N.Y. 2005) (explaining history). In _Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y._, 337 F.3d 139 (2d Cir. 2003), this Court ruled in favor of the OIN with respect to those three other actions, but vacated the Madison County action, which we found to have been dealt with in a "procedurally improper" manner by the district court. _Id._ at 170; _see also_ _id._ at 145-46, 171. The Supreme Court granted certiorari with respect to the three actions in which we had ruled in the OIN's favor, and

to enjoin the defendants-appellants Madison and Oneida Counties (the "Counties") from foreclosing on this property for non-payment of county taxes. On cross-motions for summary judgment brought in both of the cases that are consolidated on this appeal, the district court ruled in favor of the OIN. See Oneida Indian Nation v. Oneida County, 432 F. Supp. 2d 285, 292 (N.D.N.Y. 2006) ("Oneida County"); Oneida Indian Nation of N.Y. v. Madison County, 401 F. Supp. 2d 219, 232-33 (N.D.N.Y. 2005) ("Madison County"). We affirm on the ground that the OIN is immune from suit under the long-standing doctrine of tribal sovereign immunity. The remedy of foreclosure is therefore not available to the Counties.

The Stockbridge-Munsee Community, Band of Mohican Indians ("Stockbridge")[2] filed a motion to intervene in Oneida County pursuant to Federal Rule of Civil Procedure 24(a), with the goal of obtaining dismissal of that action to the extent that the land at issue was found to overlap with Stockbridge's purported six-square-mile reservation. The district court rejected Stockbridge's motion, finding that Stockbridge could not demonstrate an interest in the Oneida County litigation. See 432

reversed in Sherrill, 544 U.S. 197. The instant case is thus closely related to Sherrill, although it does not involve any identical actions.

[2] Stockbridge is referred to by various similar names in the papers before us. We employ that used by its counsel in its brief submitted to this Court.

4

F. Supp. 2d at 291-92. We conclude that this was not an abuse of discretion.

**BACKGROUND**

The history of the land at issue here and transactions affecting it has been set forth at some length in several other opinions of this and other courts. See, e.g., Sherrill, 544 U.S. at 203-12; Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y., 337 F.3d 139, 146-52 (2d Cir. 2003) ("Oneida Indian Nation of N.Y."), rev'd, Sherrill, 544 U.S. 197; Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y., 145 F. Supp. 2d 226, 232-36 (N.D.N.Y. 2001), aff'd in part, vacated and remanded in part, Oneida Indian Nation of N.Y., 337 F.3d 139, rev'd, Sherrill, 544 U.S. 197. We recite only those facts that we think are necessary for an understanding of our resolution of this appeal.

The OIN's Land

The OIN is a federally recognized Indian Tribe that is directly descended from the Oneida Indian Nation ("Oneida Nation").[3] The Oneida Nation's lands once encompassed some six

---

[3]
> Despite our use of the "OIN" acronym, the Oneida Indian Nation of New York should not be confused with the original Oneida Indian Nation, which is not a federally recognized tribe and is not a party to these consolidated cases. . . . [T]he original Oneida Indian Nation became divided into three distinct bands, the New York Oneidas, the Wisconsin Oneidas, and the Canadian Oneidas, by the middle of the nineteenth century.

Oneida Indian Nation of N.Y., 337 F.3d at 144 n.1.

million acres in what is now central New York State.  In 1788, pursuant to the Treaty of Fort Schuyler between the Oneida Nation and the State of New York, the Nation ceded title to nearly all of its land to the State, retaining a reservation of only approximately 300,000 acres.  Sherrill, 544 U.S. at 203.

In 1790, Congress passed the first Indian Trade and Intercourse Act.  See Act of July 22, 1790, ch. 33, 1 Stat. 137 ("Nonintercourse Act").  The Nonintercourse Act, which remains substantially in force today, bars the sale of tribal land without federal government acquiescence.  Sherrill, 544 U.S. at 204.  In spite of the provisions of the Act, towards the end of the 18th century and at the beginning of the 19th century, the Oneida Nation sold substantial portions of the remaining reservation land to New York State and to private parties without the federal supervision that the Act required.  See id. at 205-06; Oneida Indian Nation of N.Y., 337 F.3d at 147-48.  See also United States v. Oneida Nation of N.Y., 477 F.2d 939, 940 (Ct. Cl. 1973) (concluding that the federal government owed a fiduciary duty to protect members of the Oneida Nation in connection with their land dealings with New York State between 1795 and 1846).  That land was subsequently sold to non-Indians in free-market transactions.  See Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y., 145 F. Supp. 2d at 234 & n.3.  By 1838, the Oneida Nation had sold all but 5,000 acres of the reservation that had been created by the Treaty of Fort Schuyler.  See

Sherrill, 544 U.S. at 206. By 1920, that number had dwindled to thirty-two acres. Id. at 207.

Beginning in 1970, descendants of members of the Oneida Nation pursued federal litigation against local governments in New York in an effort to assert that certain of New York State's purchases of reservation land during the late 18th and early 19th centuries had been in violation of the Nonintercourse Act, and therefore had not terminated the Oneidas' right to possess the land. See id. at 208-11 (summarizing cases). In the 1990s, OIN tribe members also began to purchase, through open-market transactions, land that had once been a part of the Oneida Nation's reservation. See Oneida Indian Nation of N.Y., 337 F.3d at 144.

The Supreme Court's Decision in Sherrill

At issue in Sherrill were parcels of land in the city of Sherrill (located in Oneida County, New York) that had originally been part of the Oneida Nation reservation as established by the Treaty of Fort Schuyler, but that had been transferred by the Oneida Nation to one of its members in 1805, and then in 1807 sold by that person to a non-Indian. Sherrill, 544 U.S. at 211. The OIN re-acquired these parcels on the open market in 1997 and 1998. Id. In Sherrill, the OIN asserted that these properties were exempt from taxation, arguing

that because the Court in [Oneida County, N.Y. v. Oneida Indian Nation of N.Y., 470

7

U.S. 226 (1985)[4]] recognized the Oneidas' aboriginal title to their ancient reservation land and because the Tribe has now acquired the specific parcels involved in this suit in the open market, it has unified fee and aboriginal title and may now assert sovereign dominion over the parcels.

Id. at 213.  Based on that contention, the OIN had brought suit in the United States District Court for the Northern District of New York seeking injunctive and declaratory relief that would require recognition of its present and future sovereign immunity from local taxation on the land.  Id. at 214.  We agreed on the basis that "land in Indian country . . . is not subject to state taxation absent express congressional authorization."  Oneida Indian Nation of N.Y., 337 F.3d at 154 (citing, inter alia, Worcester v. State of Ga., 31 U.S. 515, 557 (1832), White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151 (1980), and Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 765 (1985)).

The Supreme Court reversed.  It "reject[ed] the unification theory of OIN and the United States and h[e]ld that 'standards of federal Indian law and federal equity practice' preclude[d] the Tribe from rekindling embers of sovereignty that long ago grew cold."  Sherrill, 544 U.S. at 214.  Noting that "justifiable expectations, grounded in two centuries of New York's exercise of regulatory jurisdiction, until recently

---

[4]  In this 1985 case, the Court permitted the OIN to seek monetary damages for the sale of its land in the late 18th and early 19th centuries, but "reserved for another day the question whether 'equitable considerations' should limit the relief available to the present-day Oneidas."  Sherrill, 544 U.S. at 213 (citing Oneida County, N.Y., 470 U.S. at 253, n.27).

8

uncontested by OIN, merit heavy weight," id. at 215-16, the Court concluded:

> [T]he distance from 1805 to the present day, the Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate.

Id. at 221.

### Madison County's Actions

Madison County has regularly assessed taxes with respect to the parcels of land in the county that were purchased by the OIN in the 1990s that are claimed to lie within the boundaries of the reservation described in the Treaty of Fort Schuyler. See Madison County, 401 F. Supp. 2d at 223. Each year in which the OIN failed to pay property taxes, Madison County would initiate foreclosure proceedings against the OIN-owned parcels as part of its yearly foreclosure actions in state court. Madison County would then abandon the foreclosure proceedings against the OIN-owned parcels, in anticipation of a resolution of the taxability question in Sherrill, when it became clear that the Sherrill litigation would continue for another year. Id. Madison County initiated and then abandoned foreclosure proceedings in this manner in each year until 2003, id., when this Court effectively separated the on-going Madison County litigation from the Sherrill litigation and remanded it to the

9

district court for further proceedings, see Oneida Indian Nation of N.Y., 337 F.3d at 171.

On November 14, 2003, the county instituted a foreclosure action with respect to such OIN-owned property in New York State court. Madison County, 401 F. Supp. 2d at 223. This time, however, the county did not abandon these foreclosure proceedings as it has done in previous years. A Petition and Notice of Foreclosure was mailed to the owners of property that the county was seeking foreclosure upon for non-payment of taxes, including the OIN, on December 8, 2004, and was published in December 2004 and January 2005. Id. It specified March 31, 2005, as the last day for redemption of these properties.[5] Id. The Supreme Court decided Sherrill on March 29, 2005, just two days before this final day of redemption. Id. On April 28, 2005, Madison County moved for summary judgment in the 2003 state court foreclosure action. Id. In the instant federal proceedings, however, which had been pending in the district court following this Court's remand in 2003, the district court issued a preliminary injunction enjoining the state foreclosure

---

[5] New York Real Property Tax Law § 1110 requires at least two years of notice prior to the expiration of a redemption period. The OIN contends, and the district court agreed, that it was a violation of constitutional due process guarantees for the county to fail to comply with this two-year notice provision by issuing notice on December 8, 2004, that the redemption period would expire on March 31, 2005, less than two years later. Because we decide this case on other grounds, we need not and do not reach this ruling. We also do not reach a similar due process argument that is made with respect to Oneida County's foreclosure procedures.

proceedings.  See id.; Oneida Indian Nation of N.Y. v. Madison County, 376 F. Supp. 2d 280, 283 (N.D.N.Y. 2005).

Oneida County's Actions

Oneida County follows a property tax foreclosure procedure that is different from Madison County's.  Pursuant to county law, the county arranges for and advertises a tax auction for the sale of any property on which taxes, which are uniformly due on January 31, are delinquent by six months or more. See Oneida County, 432 F. Supp. 2d at 287.  The tax sale is held on the last business day of December.  Id.  The delinquent taxpayer then has three years to redeem the property, and an additional thirty days following receipt of a Final Notice Before Redemption.  Id. at 287-88.  This process was adhered to with respect to all 280 OIN-owned parcels located within both Oneida County and, allegedly, the reservation boundaries established by the Treaty of Fort Schuyler.  During the summer and early autumn of 2005, Final Notices Before Redemption were delivered to the OIN regarding 187 of those parcels.  Id. at 288.  On October 28, 2005, the OIN sought and received a restraining order preventing further foreclosure efforts against any of the 280 parcels, pending this outcome of this litigation.  See id.

Stockbridge

Stockbridge seeks to intervene in these proceedings based on its contention that fifty-two land parcels (two in Oneida County and fifty in Madison County) are part of an undiminished reservation of the Stockbridge Band rather than the

11

Oneidas. There is litigation pending addressing this claim in the Northern District of New York. See Stockbridge-Munsee v. State of New York, No. 3:86-CV-1140 (N.D.N.Y. Oct. 15, 1986). Stockbridge argues that the Treaty of Fort Schuyler set aside a six-square-mile permanent reservation for the Stockbridge Band, separate from a surrounding 250,000 acre tract reserved for the Oneidas.

### District Court Proceedings

In both of the cases consolidated on appeal, the district court concluded that the remedy of foreclosure was not available to the Counties on four independent grounds: 1) the Nonintercourse Act renders the OIN's properties inalienable and therefore not subject to foreclosure, see Madison County, 401 F. Supp. 2d at 227; Oneida County, 432 F. Supp. 2d at 289; 2) tribal sovereign immunity bars suit against the OIN, see Madison County, 401 F. Supp. 2d at 228-29; Oneida County, 432 F. Supp. 2d at 289; 3) the Due Process Clause of the Fifth Amendment was violated by the Counties' failure to give the OIN adequate notice of the expiration of the redemption period, see Madison County, 401 F. Supp. 2d at 230; Oneida County, 432 F. Supp. 2d at 289-90; and 4) the land in question is exempt from taxation under New York State law, see Madison County, 401 F. Supp. 2d at 231; Oneida County, 432 F. Supp. 2d at 290.

The district court denied Stockbridge's motion to intervene in Oneida County on the ground that Stockbridge could

12

not demonstrate sufficient interest in the litigation. See 432 F. Supp. 2d at 291-92.

The Counties appeal from the grant of summary judgment against them. Stockbridge appeals from the district court's denial of its motion to intervene. The State of New York appears as amicus curiae in support of the Counties, urging us to reverse the decision of the district court. Upon order of this Court, the United States also submitted a brief as amicus curiae. In that brief, the United States urges us to affirm on the ground that the OIN's tribal sovereign immunity bars the Counties' efforts to foreclose on OIN-owned land.

Since this Court heard oral argument in this matter, there have been several developments that affect the practical implications of this Court's decision on Madison and Oneida Counties. While these developments do not render moot any of the issues before this Court on appeal, we think it useful to describe them briefly.

In a Record of Decision issued on May 20, 2008, in response to the OIN's application, the Department of the Interior determined that it would take 13,003.89 acres of the OIN-owned land at issue in this appeal into trust, pursuant to 25 U.S.C. § 465 and 25 C.F.R. Part 151. See Department of the Interior, Record of Decision, May 20, 2008 ("Record of Decision"). Notice of this decision was published in the Federal Register on May 23, 2008. 73 Fed. Reg. 30144. This land will no longer be subject to state or local taxation. 25 U.S.C. § 465. As a result, only

13

approximately 4,000 of the 17,000 acres of property originally at issue in this case will remain subject to state and local taxation in the future.

In connection with the land trust, in order to satisfy the trust regulations, the OIN has posted letters of credit securing the payment of all taxes, penalties, and interest determined by the courts to be due on the land at issue and has agreed to supplement or replace those letters to secure payment of any additional penalties and interest that may accrue while litigation concerning the trust decision is pending. Record of Decision at 53. These letters cover substantially all taxes, penalties, and interest assessed on all of the OIN-owned property at issue in this case, including those parcels that the Department of the Interior has decided not to take into trust. Accordingly, notwithstanding this Court's decision on this appeal, it appears that the Counties will receive back payment of all taxes, penalties, and interest due on the property at issue in this lawsuit. Despite this development and the practical implications it has for the parties in this case, we reiterate that it does not render moot any of the issues raised on nor affect our consideration of this appeal.

**DISCUSSION**

I.   Standard of Review

"We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its

14

favor." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998); see also Fed. R. Civ. Pro. 56(c).

## II.   Tribal Sovereign Immunity

### A.   The Distinction Between Sovereign Authority Over Reservation Lands And Sovereign Immunity From Suit

The Counties assert that the Supreme Court's decision in Sherrill requires reversal here because the Sherrill Court ruled that the land in question is not sovereign tribal land, and it is therefore subject to taxation.  The Counties interpret Sherrill to hold that the OIN cannot assert sovereign immunity to prevent a foreclosure action on such land.

We think that this argument improperly conflates two distinct doctrines: tribal sovereign authority over reservation lands and tribal sovereign immunity from suit.  The freedom from state taxation, in the broader context of immunity from state regulation, which is addressed in Sherrill, arises from a tribe's sovereign authority over its reservation lands.  This sovereign authority was examined by the Supreme Court as early as 1832:

> From the commencement of our government, congress has passed acts to regulate trade and intercourse with the Indians; which treat them as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate.  All these acts . . . manifestly consider the several Indian nations as distinct political

15

> communities, having territorial boundaries, within which their authority is exclusive . . . .

Worcester v. State of Ga., 31 U.S. 515, 556-57 (1832) (Marshall, C.J.), abrogated on other grounds as recognized by Nevada v. Hicks, 533 U.S. 353, 361-62 (2001) (remarking that "the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation."). "The conceptual clarity of Mr. Chief Justice Marshall's view in Worcester . . . has given way to more individualized treatment of particular treaties and specific federal statutes." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148 (1973).

But the Supreme Court has "categorical[ly]" maintained that "[a]bsent cession of jurisdiction or other federal statutes permitting it, . . . a State is without power to tax reservation lands and reservation Indians." County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 258 (1992) (internal quotation marks omitted). This principle has been traced in later Supreme Court decisions to Worcester and other cases of its era. See, e.g., id. at 257-58; Mescalero, 411 U.S. at 148; Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 764 (1985).

When the Supreme Court held in Sherrill that the OIN could not "rekindl[e] embers of sovereignty that long ago grew cold," 544 U.S. at 214, the sovereignty to which it was referring was of the sort described in Worcester and its progeny. Indeed, the decision of this Court that Sherrill reversed had focused on

16

this land-based "Indian sovereignty doctrine," Oneida Indian Nation of N.Y., 337 F.3d at 155 (internal quotation marks omitted), that had emerged from Worcester and other 19th century cases, see id. at 153-55.  The Supreme Court applied this doctrine to the facts at hand in Sherrill when rejecting the OIN's prayer for relief.

That doctrine is different, however, from the doctrine of tribal immunity from suit.  While the tax exemption of reservation land arises from a tribe's exercise of sovereignty over such land, and is therefore closely tied to the question of whether the specific parcel at issue is "Indian reservation land," Cass County, Minn. v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 110 (1998), a tribe's immunity from suit is independent of its lands.[6]  See Kiowa Tribe of Okla. v. Mfg.

---

[6]  Thus, we need not reach the Counties' argument that the OIN's reservation has been disestablished.  Our conclusion does not depend upon it.  We note, however, that the Supreme Court in Sherrill explicitly declined to resolve the question of whether the Oneida reservation had been "disestablished," thus rendering the land in question no longer part of a reservation or otherwise part of "Indian country" as defined by 18 U.S.C. § 1151.  Compare Sherrill, 544 U.S. at 214 n.8 ("We resolve this case on considerations not discretely identified in the parties' briefs . . . .") with City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y., 2004 WL 1835364 at *i, 2004 U.S. S. Ct. Briefs LEXIS 492 at **1 (U.S. Aug. 12, 2004) (Appellate Br. for Pet.) (stating that one of the questions presented for review was "[w]hether alleged reservation land is Indian country pursuant to 18 U.S.C. § 1151 . . . .").  Our prior holding on this question -- that "the Oneidas' reservation was not disestablished," Oneida Indian Nation of N.Y., 337 F.3d at 167 -- therefore remains the controlling law of this circuit.  See, e.g., Roman v. Abrams, 822 F.2d 214, 226 (2d Cir. 1987) (deciding that remand by the Supreme Court did not disturb the precedent set by the portions of the remanded case that the Supreme Court did not reach).

17

_Tech., Inc._, 523 U.S. 751, 754 (1998) ("[O]ur cases have sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred.").

The doctrine of tribal immunity from suit has a distinctive history in the Supreme Court.  As the Court explained in _Kiowa_:

> Though the doctrine of tribal immunity [from suit] is settled law and controls this case, we note that it developed almost by accident. The doctrine is said by some of our own opinions to rest on the Court's opinion in _Turner v. United States_, 248 U.S. 354 (1919). Though _Turner_ is indeed cited as authority for the immunity, examination shows it simply does not stand for that proposition.
>
> . . . .
>
> _Turner_'s passing reference to immunity, however, did become an explicit holding that tribes had immunity from suit.  We so held in [_United States v. U.S. Fidelity & Guar. Co._, 309 U.S. 506 (1940)], saying: "These Indian Nations are exempt from suit without Congressional authorization." [_Id._] at 512 (citing _Turner_, _supra_, at 358).  As sovereigns or quasi sovereigns, the Indian Nations enjoyed immunity "from judicial attack" absent consent to be sued.  Later cases, albeit with little analysis, reiterated the doctrine.
>
> The doctrine of tribal immunity came under attack a few years ago in [_Okla. Tax Comm'n v. Citizen Band] Potawatomi [Indian Tribe of Okla._, 498 U.S. 505 (1991)] . . . .  We retained the doctrine, however, on the theory that Congress had failed to abrogate it . . . .
>
> [There are] considerations [that] might suggest a need to abrogate tribal immunity, at least as an overarching rule.  Respondent does not ask us to repudiate the principle outright, but suggests instead that we confine it to reservations or to noncommercial activities.  We decline to draw

18

this distinction in this case, as we defer to the role Congress may wish to exercise in this important judgment.

Congress has acted against the background of our decisions. It has restricted tribal immunity from suit in limited circumstances. And in other statutes it has declared an intention not to alter it.

. . .

Congress "has occasionally authorized limited classes of suits against Indian tribes" and "has always been at liberty to dispense with such tribal immunity or to limit it." Potawatomi, supra, at 510. It has not yet done so.

523 U.S. at 756-59 (citations omitted).

The Kiowa Court highlighted the separate and independent natures of the doctrines of tribal immunity from taxation and other powers of the state, and tribal immunity from suit that controls the case at bar:

We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country. To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. In Potawatomi, for example, we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes. There is a difference between the right to demand compliance with state laws and the means available to enforce them.

Id. at 755. (citations omitted).

While the doctrine of tribal sovereign authority over land has "undergone considerable evolution [in the Supreme Court] in response to changed circumstances," McClanahan v. State Tax

19

Comm'n of Ariz., 411 U.S. 164, 171 (1973), the doctrine of tribal immunity from suit has not. The Kiowa Court indicated in the portion of the opinion set forth above that it looks to Congress for any such change.

In light of this history, we do not read Sherrill as implicitly abrogating the OIN's immunity from suit. No such statement of abrogation was made by the Sherrill Court, nor does the opinion call into question the Kiowa Court's approach, that any such abrogation should be left to Congress. Sherrill dealt with "the right to demand compliance with state laws." Kiowa, 523 U.S. at 755. It did not address "the means available to enforce" those laws. Id.

B. Application to the Case at Bar

We are left then with the rule stated in Kiowa: "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Id. at 754. We therefore agree with the district court that the remedy of foreclosure is not available to the Counties unless and until Congress authorizes such suits or the OIN consents to such suits. Because neither of these events has occurred, the foreclosure actions are barred by the OIN's immunity from suit.

The Counties argue that the notion that they may tax but not foreclose is inconsistent and contradictory. To be sure, the result is reminiscent of words of the nursery rhyme:

Mother, may I go out to swim?

20

> Yes, my darling daughter;
> Hang your clothes on a hickory limb,
> And don't go near the water.[7]

Or, as the Counties more soberly assert, such a rule "eviscerates" Sherrill, "making that essential right of government [to tax properties] meaningless." Appellants' Br. at 51.

But a similar argument was rejected by the Supreme Court in Potawatomi.[8] There, the Court held that Oklahoma had the authority to tax certain cigarette sales made at the tribe's convenience store. Potawatomi, 498 U.S. at 512. The Court also ruled that the tribe's immunity from suit prevented the state from bringing suit to collect unpaid taxes. The Court reconciled these two rulings thus:

---

[7] Quoted in, e.g., Rose Cecil O'Neill, "The Hickory Limb" (1907), available at www.gutenberg.org/files/28886/28886-8.txt (last visited Mar. 19, 2010).

[8] The Counties argue that a right without a remedy is meaningless. Despite Chief Justice Marshall's eloquent statement that the government of the United States cannot be called a government of laws "if the laws furnish no remedy for the violation of a vested legal right," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803), our courts often conclude that there is no remedy to vindicate the violation of a right. Consider the doctrine of qualified immunity. In cases raising the issue of qualified immunity, a state actor may have violated the plaintiff's constitutional rights, but the court nevertheless decides that the actor is entitled to qualified immunity. See, e.g., Moore v. Andreno, 505 F.3d 203 (2d Cir. 2007) (holding that plaintiff's Fourth Amendment rights were violated but that defendants were entitled to qualified immunity because that right was not clearly established). In these cases, there was a "violation of a vested legal right," but the "laws furnish no remedy." Marbury, 5 U.S. at 163.

21

> Oklahoma complains that, in effect, decisions such as Moe[ v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976),] and [Washington v. Confederated Tribes of] Colville [Reservation, 447 U.S. 134 (1980), (authorizing taxation in certain circumstances)] give them a right without any remedy. There is no doubt that sovereign immunity bars the State from pursuing the most efficient remedy, but we are not persuaded that it lacks any adequate alternatives. We have never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State . . . . States may also enter into agreements with the tribes to adopt a mutually satisfactory regime for the collection of this sort of tax. And if Oklahoma and other States similarly situated find that none of these alternatives produce the revenues to which they are entitled, they may of course seek appropriate legislation from Congress.

498 U.S. at 514 (citations omitted).

Individual tribal members and tribal officers in their official capacity remain susceptible to suits for damages and injunctive relief. See Puyallup Tribe, Inc. v. Dep't of Game of State of Wash., 433 U.S. 165, 171 (1977) ("[W]hether or not the Tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members is permissible."). They may therefore be enjoined from violations of state law. But if such enforcement mechanisms fail and if no agreement can be reached between the Counties and the OIN, the Counties' ultimate recourse will be to Congress, as we understand the Supreme Court to have instructed.

22

Because we affirm on the ground that the foreclosure actions are barred by the OIN's sovereign immunity from suit, we need not and do not reach the other three rationales relied upon by the district court.

III.  Abstention

The Counties argue that the district court "erred as a matter of law in refusing to abstain from interfering with the Counties' tax foreclosure process."  Appellants' Br. at 105.  "We evaluate a district court's determination not to abstain . . . de novo, because it implicates the court's subject matter jurisdiction."  Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 90 (2d Cir. 2004).  We agree with the district court, see Madison County, 401 F. Supp. 2d at 225, that abstention is not appropriate here.

The Counties' abstention argument appears to be based on 28 U.S.C. § 1341, which states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  As the Counties note, though, in Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976), the Supreme Court created an "exception to the general rule barring federal interference with state tax administration."  Appellants' Br. at 106.  The Moe Court concluded that Indian tribes should be permitted to bring federal lawsuits that the United States could have brought on a tribe's behalf as trustee -- a principle that

23

the Court found expressed in the legislative history of 28 U.S.C. § 1362, which provides that "[t]he district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." The Court decided that inasmuch as "the United States [was] not barred by § 1341 from seeking to enjoin the enforcement of a state tax law, . . . the Tribe [was] not barred from doing so . . . ." Moe, 425 U.S. at 474-75 (citation omitted).

The Counties argue that this exception is inapplicable here because "Sherrill held that local government -- and not OIN -- has full sovereignty over the land at issue." Appellants' Br. at 106. But Moe does not depend on whether a tribe has sovereignty over any particular land. We perceive no reason why, because of Sherrill or otherwise, the holding of Moe should not apply to the case at bar. Accordingly, we decline to order the district court to abstain from exercising jurisdiction over this matter.

IV.  Stockbridge's Motion to Intervene

Stockbridge appeals from the district court's denial of its motion to intervene in the Oneida County litigation as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2).[9] We review the district court's denial of a Rule 24(a)

---

[9] Stockbridge does not appeal the district court's denial of its motion to intervene in the Madison County case.

24

motion for abuse of discretion. <u>Brennan v. N.Y. City Bd. of Educ.</u>, 260 F.3d 123, 128 (2d Cir. 2001).

Rule 24(a)(2) states: "On timely motion, the [district] court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

> Intervention as of right under Rule 24(a)(2) is granted when all four of the following conditions are met: (1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties.

<u>MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.</u>, 471 F.3d 377, 389 (2d Cir. 2006).

Stockbridge sought to intervene for the sole purpose of seeking dismissal of this case insofar as it relates to the parcels of land that are allegedly part of the Stockbridge

---

Stockbridge does, however, argue as amicus curiae, <u>see</u> Stockbridge Br. at 11 n.4 and 40 n.10, that it was an abuse of discretion for the district court to deny Madison County's motion to file a Rule 19 motion to dismiss for failure to join an indispensable party in that case. For the reasons set forth in the Rule 24 analysis, we conclude that Stockbridge is not an indispensable party to these actions, and that the district court therefore did not abuse its discretion in denying Madison County's Rule 19 motion to dismiss.

reservation. The ground for dismissal that Stockbridge proposed to assert was that "Stockbridge is a necessary and indispensable party which enjoys sovereign immunity from suit and cannot be forced to join this action. In its absence, the suit cannot proceed and must be dismissed as to all Oneida County lands situated within the 1788 Stockbridge treaty reservation." Stockbridge Mot. to Intervene at 2, Oneida County, dated November 25, 2005. In other words, Stockbridge asserts that it is a required party under Federal Rule of Civil Procedure 19(a)(1), but that joinder is not feasible as a result of Stockbridge's immunity from suit, and dismissal is therefore warranted under Rule 19(b) because Stockbridge is an indispensable party under that rule.

Rule 19(a), governing "Required Joinder of Parties," and Rule 24(a)(2), covering "Intervention of Right,"[10] under which Stockbridge asserts its claim here, "are intended to mirror each other." MasterCard, 471 F.3d at 390. Rule 19(a) requires parties to be joined if joinder is feasible and if the parties are necessary to "accord complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A), or if, under specified circumstances, disposing of the case without that party might "(i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject

---

[10] This subsection covers such intervention other than that provided for by federal statute, which is covered by subsection (a)(1) and is not at issue here.

to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest," Fed. R. Civ. P. 19(a)(1)(B).[11] "[I]f a party is not 'necessary' under Rule 19(a), then it cannot satisfy the test for intervention as of right under Rule 24(a)(2)." MasterCard, 471 F.3d at 389.

Stockbridge argues that it is a necessary party under both Rule 19(a)(1)(B)(i) and (ii) because disposing of this matter in its absence might "as a practical matter impair or impede Stockbridge's ability to protect its interest" relating to the subject of the action, Stockbridge Br. at 8, and might also "leave the County subject to a substantial risk of incurring

---

[11]  Federal Rule of Civil Procedure 19(a)(1) reads in its entirety:

(a) Persons Required to Be Joined if Feasible.

> (1) **Required Party.** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>>
>> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>
>>> (i)  as a practical matter impair or impede the person's ability to protect the interest; or
>>>
>>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Id. (emphasis in original).

27

double, multiple, or otherwise inconsistent obligations," id. at 48.[12] But under either theory, Stockbridge must first show that it "claims an interest relating to the subject of the action." Fed. R. of Civ. P. 19(a)(1)(B). As explained in MasterCard, 471 F.3d at 390, and discussed above, Rule 24 requires a similar showing if Stockbridge is to establish the ability to intervene as a matter of right.

The district court determined that Stockbridge lacked an interest in the instant litigation and therefore denied its motion to intervene. Oneida County, 432 F. Supp. 2d at 292. We agree.

> [F]or an interest to be cognizable under Rule 24(a)(2), it must be direct, substantial, and legally protectable. An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule.

Brennan, 260 F.3d at 129 (citations and internal quotation marks omitted). Stockbridge's purported interest in this case stems from the fact that it is currently involved in litigation in which it is asserting that a portion of the land at issue here is in fact part of the Stockbridge reservation. See Stockbridge-Munsee v. State of New York, No. 3:86-CV-1140 (N.D.N.Y. Oct. 15,

---

[12] Although Stockbridge includes this statutory language in its argument, it has failed to identify any possibility that a failure to join them would subject the existing parties to inconsistent obligations.

1986).[13]  Stockbridge is therefore concerned that the present litigation could hinder its efforts to protect its property interest in that land.

The parties to this litigation do not, however, purport to put at issue the boundaries of the OIN's or Stockbridge's reservation.  Nor, with the exception of the OIN's claims under state law, do the Tribe's arguments so much as touch on the issue of the continued existence of the reservation irrespective of its boundaries.  We think that Sherrill's rejection of the "unification theory," 544 U.S. at 214, under which the OIN argued that it had "unified fee and aboriginal title and may [therefore] assert sovereign dominion over the parcels," id. at 213, has taken the question of the reservation boundaries off the table for purposes of this appeal.  What is relevant now is the OIN's assertion that it is immune from suit even if it does not have sovereign control over the land in question.  The Counties' contrary assertion is that they can foreclose on land owned by the OIN irrespective of whether it is now or ever was part of the tribe's reservation.  Stockbridge's interest in this litigation is therefore remote at best, because these assertions are unrelated to the question of reservation boundaries.[14]

---

[13]  The OIN and both of the Counties are parties to that litigation.

[14]  The Madison County district court did refer to "[t]he properties at issue" in the litigation being "located within the [Oneida] Nation's reservation."  401 F. Supp. 2d at 231.  We hardly think that this sort of comment made by a district court -- or an appellate court for that matter -- in this case,

29

Finally, we note that the manner in which we decide this appeal also renders minimal the likelihood that Stockbridge will be prejudiced by its failure to be allowed to intervene.[15]

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.

---

where neither the issue nor a party claiming otherwise is before the court, is cause for a legitimate concern on the part of Stockbridge that its rights may be adversely affected in this litigation.

[15]  In light of our conclusion, we need not reach the argument raised by the United States, as amicus curiae, that the appeal of the denial of the motion to intervene was not timely filed.

JOSÉ A. CABRANES, *Circuit Judge*, with whom JUDGE PETER W. HALL joins, concurring:

The holding in this case comes down to this: an Indian tribe can purchase land (including land that was never part of a reservation); refuse to pay lawfully-owed taxes; and suffer no consequences because the taxing authority cannot sue to collect the taxes owed.[1]

This rule of decision defies common sense. But absent action by our highest Court, or by Congress, it is the law. In the last twenty years, the Supreme Court has twice held that, although states may have a right to demand compliance with state laws by Indian tribes, they lack the legal means to enforce that right. *See Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 755 (1998) ("There is a difference between the right to demand compliance with state laws and the means available to enforce them."); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 514 (1991) (holding that states have a right to collect taxes on certain cigarette sales on an Indian reservation, but the tribe is immune from suit seeking to enforce that right). In light of this unambiguous guidance from the Supreme Court, I am bound to concur with the conclusion that, although the Counties may tax the property at issue here, *see City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005), they may not foreclose on those properties because the tribe is immune from suit.

This result, however, is so anomalous that it calls out for the Supreme Court to revisit *Kiowa* and *Potawatomi*. I wish that we were empowered to revisit those decisions, but, alas, that is not a privilege extended to intermediate appellate courts. If law and logic are to be reunited in this area of the law, it will have to be done by our highest Court, or by Congress.

Accordingly, I concur in the judgment of the Court and in the careful and comprehensive opinion of Judge Sack.

---

[1] The Department of the Interior has agreed to accept roughly 13,000 of the tribe's 17,000 acres into trust. Department of the Interior, Record of Decision, May 20, 2008. Once the land is held in trust, it will no longer be subject to state and local taxation. 25 U.S.C. § 465. To be taken into trust, however, the tribe must pay all back taxes, penalties, and interest owed on the land before it was taken into trust. 25 C.F.R. § 151.13. Accordingly, the practical effect on the Counties of our holding is limited to the 4,000 acres that will remain out of the trust.